[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
[MEMORANDUM OF DECISION]
This is an action asking that a marriage be dissolved. All jurisdictional requirements for its maintenance have been met.
The parties intermarried in Shelton, Connecticut, on July 19, 1980. There is one child issue of their relationship: Eric, born March 31, 1980. The marriage has broken down irretrievably with no CT Page 4500 hope of reconciliation. It is dissolved.
The defendant treated his obligations towards the plaintiff very lightly. He had been married three times before his marriage to the plaintiff. The plaintiff had been married once before and had been divorced in December 1976. The parties had agreed to get married and then began a sexual relationship. This resulted in the plaintiff becoming pregnant. She was elated but when she told the defendant, he left her and got married. This latter marriage lasted only a few months and then he was divorced. He wanted to come back with the plaintiff and as he was very persuasive, she agreed and they were married as stated above. This was about four months after their child, Eric, was born. The plaintiff at that time thought the defendant was wonderful and, apparently, he was that way towards her. Then on New Year's 1990, he told her he was going to a party without her. He stayed out all night and came back the next day towards noon. In the middle of January 1990, he announced he felt their marriage was dead, and told her that she should get on with her life. This was undoubtedly caused by the plaintiff's discovery in late 1989 that she had a chronic debilitating illness called scleroderma which results in fatigue, depression, diminished concentration and affects her ability to type. Formerly, she could type 50 to 60 words per minute. Her doctor also testified that she suffers from an adjunct of scleroderma which results in discoloration of her fingers and creates extreme sensitivity to cold in her fingers, hands and feet. He also testified that this disease cannot be cured and only gets worse with the passage of time.
The court does not believe the defendant's claim that the marriage had broken down several months before the plaintiff learned of this disability of hers.
The plaintiff became shocked, hysterical, sick and stressed out at the defendant's reaction to her physical problems and wanted to work things out. He refused and had no further physical relationship with her. He announced he had new interests in his life and stopped wearing his wedding ring. He also moved out of their bedroom to a room where he slept alone.
The plaintiff about this time found a Valentine which Debbie, a former wife of the defendant, had given him. He told the plaintiff it was for things he had done for Debbie. The plaintiff also found a sales slip in the glove compartment of his car for a diamond necklace he had given Debbie. CT Page 4501
Also, in his testimony, the defendant admitted having sexual relations with a Marilyn Johnson, a coworker of his at Sikorsky.
When the defendant found out that the plaintiff was pregnant by him, he walked out of their engagement. Now that she has a worsening, debilitating disease which will undoubtedly require him to take care of her, he wants to walk out on her again with no future responsibility towards her.
After the defendant announced he was leaving, the plaintiff locked him out of their home by changing the locks on the doors. He then moved into the house a short distance away, where Debbie was living.
The defendant is the sole cause of the breakdown of the marriage and the plaintiff did not contribute to the breakdown in any way.
The plaintiff owned the home at 27 Commodore Avenue, Shelton, in which the parties were living. It had a small mortgage on it and when the mortgage was paid off, the plaintiff was persuaded by the defendant to put a home equity loan on the property which Exhibit C shows the balance was of March 8, 1993 to be $39,447. What this money was spent for was not specifically stated in the evidence. There was general testimony it was used for lumber for a deck on the house, to screen in the porch, to pave a driveway, to do some work in the basement, to buy some new furniture, to pay off the loan on the plaintiff's car, to buy a car for the defendant, and to buy him a personal computer. However, no bills were offered as evidence corroborating any of these expenditures or the amounts thereof except as to the defendant's car.
The defendant claims an interest in the plaintiff's house because of the amount of work he did on the house and for caring for the plaintiff's three children by her former marriage. He estimates the value of this claim to be $60,000. This claim has no merit whatsoever and is denied.
The parties are awarded custody of their son, Eric, jointly. He shall live with the plaintiff and the defendant shall have liberal visitation with him. The defendant shall pay support for Eric in the amount of $100 a week.
The defendant shall pay alimony to the plaintiff in the amount CT Page 4502 of $200 a week until she dies, remarries or cohabits within the meaning of the statute.
When the parties were married, as stated above, there was a small mortgage on the property which became their marital home. That mortgage was paid off. Then in June 1987, the parties borrowed on the property by the home equity loan mentioned above. The mortgage securing that loan is still on the property.
The defendant filed three Financial Affidavits with the court during the course of the proceedings. They are dated 5/18/90, 10/8/92 and 1/20/94. The affidavits list in Section 4, "Assets, G. Deferred Compensation Plus". The first of these affidavits in that section lists: "Pension Amount Unknown." The second in that section lists nothing. The third in that section lists: "Pension-value unknown. Def. savings plan (401K) approx. $43,000 +."
Plaintiff's Exhibit F is a series of documents from the defendant's employer. It is dated March 10, 1993. Under "Savings Plan" it states:
 "Savings Plan. Mr. Gilbertson is a vested member of the United Technologies Corporation (UTC) Employee Savings Plan and the market value of the account, as of 1/31/93 is $59,516.72. He joined the plan July 1, 1978 and took withdrawals on 6/29/79, 9/30/80, 11/30/83 and 7/31/90. The dollar value of the 7/31/90 withdrawal was $9,405.52. We do not retain withdrawal amount records prior to 1985."
The seventh sheet in Exhibit F shows that the defendant's contribution to this plan to be $32,459.66.
The defendant's Financial Affidavits dated 10/8/92 and 1/20/94 shows that the $39,000 Home Equity Loan was made in June 1987. Subtracting the $6900 cost of the car the defendant bought from the $39,000 out of the loan leaves $32,100, which is about equal to the amount of $32,459.66, the defendant's employer reported as being the defendant's contribution to the defendant's saving plan on Exhibit F.
The court finds as a fact that the defendant took the proceeds of the Home Equity Loan and used it to his sole advantage by using part to buy the car and by investing the balance in his company's saving plan. CT Page 4503
Because the defendant appropriated the entire amount of the $39,000 loan for his own use, he is ordered to repay the entire $39,000 loan beginning immediately and continuing until the loan is fully repaid. He is also ordered to indemnify and save harmless the plaintiff from any liability for the entire amount of the outstanding balance of said loan or any lesser part. He has benefitted [benefited] by appropriating the entire loan to his own use. Exhibit F shows that the $39,000 less the amount he used to buy the car has a market value of $53,068.81 as of 1/31/93. He can have little complaint about this ruling.
The defendant shall pay one-half of the premiums for all policies of any of the health insurance provided by his employer for the benefit of the plaintiff for the statutory period and the plaintiff shall pay the balance of said premiums. The defendant also shall take whatever steps are necessary for the plaintiff to be the beneficiary of such insurances.
The defendant shall maintain the total amount of any insurance available to him through his employer for the benefit of Eric as long as he is employed.
When the defendant retires and takes any pension due him, he shall notify the plaintiff and she shall have the choice to continue to be paid by the plaintiff the $200 per week alimony set out above or she shall have the right to give up such $200 per week and to receive from the defendant one-third of the gross amount of his pension and the defendant shall see that she is paid said amount at the same time as he is paid until she dies, remarries or cohabits within the meaning of the statute.
The defendant shall contribute to the fees of the plaintiff's attorney $2000 which amount shall be paid to the plaintiff by 90 days from the date hereof.
Should the defendant presently be in arrears on any amount he owes the plaintiff or concerning any amount the plaintiff has paid in his behalf he shall pay said amount or amounts to the plaintiff within 30 days.
The plaintiff shall allow the defendant to remove from the premises at 27 Commodore Avenue, Shelton, or from any place they may be presently stored, the following items of personal property the defendant wants: the piano, the computer, the 14 foot Jon CT Page 4504 Boat, the table saws, and the camper.
The plaintiff may, if she so chooses, resume her maiden name of Kalinich.
Thomas J. O'Sullivan Trial Referee